## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DAVID L. ARCHER, *et al.*, | : | 1:13-cv-2826 |
| | : | |
| Plaintiffs, | : | Hon. John E. Jones III |
| | : | |
| v. | : | |
| | : | |
| YORK CITY SCHOOL DISTRICT, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## <u>MEMORANDUM</u>

### December 28, 2016

Plaintiffs are students and parents of students formerly enrolled at New Hope Academy Charter School ("New Hope").  Defendants are the York City School District ("the District" or "the City School"), five members of the Board of Directors for the School District of the City of York ("the Board"), and certain administrative personnel presently and formerly employed by the District ("the Administration Defendants"), including Eric B. Holmes, the current Superintendent of the District; Deborah Wortham, the former Superintendent; Mindy Wantz, the District Secretary and Right to Know Officer; and Valerie Perry-Cross, the former Assistant Superintendent for Pupil and Personnel Services.

Plaintiffs commenced this action, asserting various legal claims in protest of the Board's decision not to renew New Hope's charter.  Presently pending before this Court is Defendants' Motion for Summary Judgment.  (Doc. 129).  For the

reasons set forth below, we shall grant Defendants' Motion for Summary Judgment in full.

## I.   FACTUAL BACKGROUND

### A.   The York City School District

New Hope was a charter school located in the city of York, Pennsylvania, within the jurisdiction of the York City School District.  Children within the York City School District suffer disproportionate financial disadvantage when compared to the rest of York County, with about 81.3% of students identified as economically disadvantaged by the Pennsylvania System of School Assessment ("PSSA").  (Doc. 69, ¶ 66).  Students within the District boundaries largely do not meet state academic standards, and test scores have fallen over time.  (*Id.* ¶¶ 67-69).[1]  From 2009 to 2011, 263 students dropped out of York City schools.  (*Id.* ¶ 70).

With the City School in marked decline, more and more students were choosing charter schools instead of public schools.  (*Id.* ¶ 72).   In the 2012-13 academic year, there were 7,658 students enrolled within the District, with 62.7% of those students attending York City schools and 31.8% attending charter or non-public schools.  (*Id.* ¶ 65).  According to Plaintiffs, the City School District has

---

[1] Plaintiffs offer that, in 2005, 51% of York City School District students attained a score of proficient or above in math, and 65% scored proficient or above in reading.  (Doc. 69, ¶ 69).  By 2012, scores had worsened, with 32% scoring proficient or above in math, and 33% scoring proficient or above in reading.  (*Id.*).

recognized that continued tuition payments to charter schools will cast the District into dire financial straits.  (*Id.* ¶ 73).

In December 2012, the Commonwealth of Pennsylvania declared the York City School District to be financially distressed.  (*Id.* ¶¶ 116, 118).  Some District officials publicly attributed the financial drain on the District to charter schools. For instance, at a 2011 school board meeting, one official urged that the District must "go to war" with charter schools, remarking that "[w]e have to build our campaign [against] charter schools."  (*Id.* ¶ 181).  Also in 2011, the then-president of the Board of School Directors expressed that "one of the reasons why this budget is so out of whack is the loss of our students [to charter schools]."  (*Id.* ¶ 180).  Also, on November 14, 2013, a District representative commented that, "if New Hope were to remain open indefinitely, it could adversely affect the district's financial recovery plan . . . ."  (*Id.* ¶ 185 (emphasis omitted)).

On December 12, 2012, Chief Recovery Officer David G. Meckley was appointed to develop a Financial Recovery Plan for the District.  (*Id.* ¶¶ 117-18). Meckley issued his report on May 15, 2013, revealing that in 2011-2012, the District's tuition payments to charter schools totaled $24.8 million.  (*Id*. ¶¶ 119, 122).   In 2012-2013, 25.1% of the District's budget was allocated for charter school educational costs.  (*Id.* ¶ 123).  Meckley's report concluded that the District must reduce or reverse payments to charter schools to avoid financial ruin,

estimating that, if the District continued on the same course, it would have an annual $17 million deficit and debt exceeding $55 million by 2018.  (*Id.* ¶¶ 124-26).

### B.  New Hope Academy Charter School

New Hope's charter was first approved on March 12, 2007, with an effective date of July 1, 2007.  (*Id.* ¶ 81).[2]  The charter provided that for its "measurable academic goals and objectives," New Hope was to strive to ensure that "[t]he student will meet the proficient level in language arts and mathematics."  *New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.2d 731, 733 (Pa. Commw.Ct. 2014) (citing New Hope Charter and Charter Application at 15). "New Hope's charter also provided that achievement of its goals and objectives would be measured by the Pennsylvania System of School Assessment (PSSA), stating that 'scores from PSSA will be used to measure the student progress in regards to the State Standards.'"  *Id.*[3]

New Hope began by serving grades 7 and 8.  By the time of its dissolution in June 2014, New Hope had incrementally expanded to serve grades 5 through 12

---

[2]  New Hope's charter was approved pursuant to the Charter School Law, Act of March 10, 1949, P.L. 30, added by the Act of June 19, 2997, P.L. 225, as amended, 24 P.S. §§ 17-1701-A— 17-1751-A.  *See New Hope Acad. Charter Sch. v. Sch. Dist. of the City of York*, 89 A.2d 731, 733 n.1 (Pa. Commw.Ct. 2014).

[3]  While New Hope's charter was not provided as a matter of record in the instant case, it was apparently provided to the Pennsylvania Commonwealth Court and reproduced in that court's opinion's facts section.  Because we find the information relevant to the instant matter, we include it here as well.

and enrolled approximately 800 students.  (Doc. 69, ¶¶ 77, 81, 89).  Throughout

New Hope's growth, marked by various successful applications to amend its

charter to add new grade levels and programming, the District never expressed any

concerns to New Hope regarding New Hope's administration or academics.  (*Id.* ¶¶

84, 86, 88, 90, 92).  In fact, during a site visit on May 22, 2012, then-Pennsylvania

Secretary of Education Carolyn Dumaresq praised New Hope for its exceptional

facilities and stewardship of public monies.  (*Id.* ¶¶ 93-95).  Defendants emphasize,

however, that in approving the amendments to New Hope's charter, the District

"did not conduct a comprehensive review of New Hope's operations."  (Doc. 130,

¶ 22).[4]

In Plaintiffs' view, charter schools have provided hope to parents whose

children previously have had to attend the failing City School and who cannot

afford to relocate or send their children to private school.  (Doc. 69, ¶¶ 139-41).

For example, Plaintiffs submit that New Hope's graduation rate for 12th grade

students was consistently at or above 91%, compared to the City School's

graduation rate of 74%.  (*Id.* ¶¶ 99, 142).  A number of New Hope seniors were

granted full scholarships at state universities based on their class rank, and New

Hope graduates were awarded over $1 million annually in merit scholarships.  (*Id.*

---

[4]  Plaintiffs deny this fact and argue that the District conducted an "exhaustive review" each time
New Hope sought to amend its charter.  (Doc. 134, ¶ 22).

¶¶ 144-45).   Plaintiffs also feel that New Hope was safer than the City Schools.

(*Id.* ¶ 146).

Defendants generally disagree with this characterization of New Hope.

They stress that New Hope's students' "PSSA scores"[5] were "generally lower"

than the scores of students who attended the District's schools.  (Doc. 130, ¶ 40).

New Hope also failed to achieve Adequate Yearly Progress ("AYP") during any of

the academic years that New Hope operated.  AYP represents a measurement of

student progress established by the No Child Left Behind Act of 2002.  (Doc. 130,

¶ 46).  It measures schools by the scores their students achieve on the PSSA but

also provides "safe harbor and growth methods based on reductions in the

percentage of non-proficient students and improvements on scores toward

proficiency." *New Hope*, 89 A.2d at 734.  Unlike New Hope, some District

schools have sporadically achieved AYP at different times throughout their

operation.  However, Plaintiffs stress that not a single school within the York City

School District has ever met the AYP minimum performance standards.  (Doc.

134, ¶¶ 44-46).[6]

In fall 2011, New Hope hired an education consultant, Dr. Michael Clemens.

*New Hope*, 89 A.2d at 734.  Dr. Clemens was retained to help New Hope improve

[5]  The Pennsylvania System of School Assessment ("PSSA") is a set of standardized tests
administered annually in Pennsylvania schools.  (Doc. 130, ¶ 39; doc. 134, ¶ 39).

[6]  Where a school fails to meet AYP on average more than four out of every five years it is in
operation, that school fails to meet the minimum performance standards. (Doc. 134, ¶¶ 45-46).

its academic performance. *Id*. He concluded that New Hope "was weak in the areas of 'curriculum, instruction, and assessments aligned with state standards,' 'the frequent monitoring of learning and teaching,' 'and 'focused professional development.'" *Id*. (quoting Board Opinion at 29; School Board C.R. February 29, 2012 H.T. at 86-87, R.R. at 298a-299a). Ultimately, Dr. Clemens determined that New Hope's curriculum was "not aligned with Pennsylvania state academic standards as required by 22Pa. Code Chapter 4." *Id*.; (doc. 130-29, p. 5).

### C.   Nonrenewal and the Administrative and Judicial Process

In 2011, New Hope applied for the renewal of its charter. (Doc. 130, ¶ 37; doc 134, ¶ 37). On January 30, 2012, the New Hope Board of Trustees received notice that the school's request to renew its charter had been denied and that nonrenewal proceedings would commence. (Doc. 69, ¶ 97; Doc. 73-1, p. 1). The notice included a list of "Preliminary Reasons For Non-Renewal of Charter" which Plaintiffs characterize as "vague and ambiguous," stating that it did not provide the details necessary for Plaintiffs to participate in the District's adjudication. (Doc. 134, ¶ 51; doc. 69, ¶ 160). According to Defendant School Board President Margie Orr, the Administration initiated the nonrenewal process and not the Board. (Doc. 69, ¶ 151).[7]

---

[7] Pursuant to the Pennsylvania Charter School Law, it is the local board of school directors that has the authority to revoke or not renew a charter. *See* 24 P.S. § 17-1729-A(a). Defendants have clarified that in their District, when a charter school applies for a renewal of its charter, the

It is Plaintiffs' belief that prior to sending the notification, individual Defendants had already determined not to renew New Hope's charter, and, as such, the non-renewal proceedings that followed were a sham.  (*Id.* ¶ 100).  Plaintiffs centrally highlight that, prior to the initiation of nonrenewal proceedings, then-Superintendent Wortham directed that the administration form a committee to create a "Checklist of Possible Reasons for Charter Denial" to effectuate the closure of New Hope.  (*Id.* ¶ 105).  Defendants agree that Superintendent Wortham requested that members of the Administration conduct a "second review" of New Hope's renewal application.  (Doc. 130, ¶ 48).  Former Assistant Superintendent Perry-Cross chaired the committee.  (*Id.* ¶ 49; doc. 69, ¶ 106).  Defendant Miller, a School Board member, attended the meetings but never disclosed his participation.  (Doc. 69, ¶ 109).

On January 9, 2012, Perry-Cross sent an email with the subject "Checklist of Possible Reasons for Charter Denial."  (Doc. 69, ¶ 111).  The committee met secretly, did not publicize its findings, and never provided New Hope with its checklist.  (*Id.* ¶¶ 107-08, 112).  Defendants, however, argue that the meeting was not "secret"—rather Defendants were under no obligation to inform New Hope of the Administration's meetings or their purpose.  (Doc. 135, p. 8).  Only meetings

---

Administration first reviews the application and then makes a recommendation to the Board regarding whether to renew the charter.  (Doc. 130, ¶ 36).

of the Board and those conducted pursuant to New Hope's non-renewal hearings and proceedings are subject to the Sunshine Act.  (*Id*.).

As asserted in their Complaint, Plaintiffs allege that the District, including the Board and administration, retained Levin Legal Group for the purpose of forming a committee to shut New Hope down.  (Doc. 69, ¶ 130).  To this end, Plaintiffs allege Attorney Allison Petersen met in private with the Board and administration, advising that they must carry out nonrenewal proceedings as a formality.  (*Id.* ¶ 133).  Defendants entirely disagree with Plaintiffs' characterization of events, and instead allege that the Levin Legal Group was hired to assist the District with charter school issues generally, including the evaluation of several applications for the creation and establishment of new charter schools. Defendants aver that Attorney Petersen advised the Board that she could not discuss the New Hope nonrenewal proceedings with them until after they voted on the matter.  (Doc. 130, ¶¶ 52-54).

On February 16, 2012, the District issued an Amended Nonrenewal Notice with the following charges:  violation of the school's charter because of failure of students to meet minimum proficiency in reading and mathematics; violation of the school's charter by accepting students beyond the first 10 days of each quarter; failure to meet the requirements for student performance as set forth in the Pennsylvania Administrative Code; violation of No Child Left Behind by failing to

make annual yearly progress, or AYP; noncompliance with attendance reporting requirements; violation of Pennsylvania law or administrative guidance related to placement of students at alternative education facilities, specifically Challenge Academy; and violations of the Pennsylvania Non-Profit Corporation Act and the Public Official and Employee Ethics Act with respect to the role and actions of Isiah Anderson, the school's founder, as related to the for-profit entities owned or controlled by him, including Challenge Academy.  (Doc. 73-1, pp. 1-3).

Plaintiffs express that many of the stated allegations existed at the time the District granted amendments to New Hope's charter but were never raised; that none of the concerns have any substantive merit; and that all of the allegations were contrived as a predetermined excuse to dissolve New Hope's charter.  (Doc. 69, ¶¶ 172-74).

Following the issuance of the Amended Nonrenewal Notice, nonrenewal proceedings were held over seven evenings in February and March 2012.  (Doc. 130, ¶ 55; doc. 134, ¶ 55).  At the school board meeting of July 18, 2012, the Board resolved not to renew New Hope's charter by a vote of 5-0.  (Doc. 73-1, p. 5).  The Board issued a 77-page Adjudication on August 15, 2012, including findings of fact and conclusions of law, in support of its decision.  (*Id.* at pp. 1-77).

New Hope appealed the Board's decision, and, on October 29, 2013, the Pennsylvania State Charter School Appeal Board ("CAB") issued a 51-page

Opinion finding that the nonrenewal of New Hope's charter was proper.  (Doc. 73-2).  The accompanying Order specified that the decision upholding nonrenewal would become effective on January 15, 2014, to allow New Hope students to complete the fall term of the 2013-2014 academic year.  (*Id.* at p. 52).  In the Opinion, the CAB specifically determined that New Hope had received adequate notice of the grounds for nonrenewal.  (*Id.* at pp. 20-22).  It explained that the Pennsylvania Charter School Law requires that a charter school be apprised of the reasons for nonrenewal "with reasonable specificity," 24 P.S. § 17-1729-A(c), and, here, determined that the grounds stated in the Amended Nonrenewal Notice complied with that directive.  (Doc. 73-2, p. 20).  The CAB further expressed that "[i]t is clear from the record that New Hope received both adequate notice of the grounds on which the School Board based its decision and the opportunity to present witnesses and evidence on each of those issues" and found that "New Hope's due process rights were not violated."  (*Id.* at p. 22).

In terms of the substantive grounds underlying the nonrenewal decision, the CAB found, among other things, that New Hope:  (1) failed to meet student performance requirements set forth in the Pennsylvania Administrative Code and the school's written charter; (2) materially violated the terms of its charter by failing to meet academic standards and neglecting to follow admission/enrollment policies provided therein; (3) violated laws governing enrollment procedures, the

placement of students in Alternative Education for Disruptive Youth ("AEDY")

programs, and truancy and student attendance reporting; and (4) along with its

related entities/officials, contravened the Ethics Act by failing to file Statements of

Financial Interest and engaging in conduct which constituted a conflict of interest.

(*Id.* at pp. 14-16; 25-51).

Thereafter, New Hope filed an Application for Stay, and the CAB issued an

order on November 21, 2013, granting a stay until June 4, 2014, which allowed

New Hope students to complete the 2013-14 academic year.  (Doc. 73-3).  On

November 26, 2013, New Hope filed a Petition for Review of the CAB's decision

in the Pennsylvania Commonwealth Court.  The Commonwealth Court issued a

decision on the merits on April 8, 2014, affirming the CAB's ruling.  *See New*

*Hope Acad. Charter Sch. v. Sch. Dist. of City of York*, 89 A.3d 731 (Pa. Commw.

Ct. 2014).

New Hope was forced to dissolve in June 2014.[8]

## II.   PROCEDURAL HISTORY

---

[8] As an additional, final allegation, Plaintiffs state that Defendants improperly purged Wortham's and Perry-Cross's emails.  (Doc. 69, ¶¶ 207-08).  Wortham's emails were subsequently discovered and Plaintiffs were notified of this development.  (Doc. 135, p. 21).  Defendants then filed a stipulated Motion to Extend this Court's Scheduling Order, which was granted to allow for further discovery on March 1, 2016.  (Doc. 116).  Arguing that Defendants knew or should have known of the pending litigation, Plaintiffs nonetheless continue to aver that Defendants are responsible for spoliation of evidence regarding Perry-Cross's emails.  (Doc. 69, ¶¶ 211-13; doc. 133, pp. 25-29).

Plaintiffs filed a Complaint on November 19, 2013 (Doc. 1), centrally contending that the rationales asserted by the Board for the nonrenewal of New Hope's charter were pretextual and that finances were the true motivator for the school's closure.  (*Id.* ¶¶ 74-75).  Plaintiffs advanced claims based on the Procedural Due Process, Substantive Due Process, and Equal Protection Clauses of the Fourteenth Amendment; conspiracy; the Due Process Clause of the Pennsylvania Constitution; and Article I § 26 of the state charter.

Defendants filed a Motion to Dismiss (Doc. 17), and we issued a Memorandum and Order on February 27, 2014, granting the motion.  (Doc. 27).  We dismissed with prejudice Plaintiffs' federal and state law claims based on procedural and substantive due process, because Plaintiffs failed to allege a deprivation of a protected interest.  (*Id.* pp. 19-21, 32-33).  However, we permitted Plaintiffs to amend their pleading to reassert their equal protection and conspiracy claims.  (*Id.* at p. 35).

Plaintiffs filed an amended complaint on March 19, 2014 (Doc. 31), and Defendants against moved to dismiss the pleading.  (Doc. 35).  The parties fully briefed the motion, but before a decision could be rendered, Plaintiffs filed a Motion for Leave to File a Second Amended Complaint on June 2, 2014, including a proposed amended pleading.  (Docs. 43, 43-4).  The appended proposed pleading added, among other things, new defendants (the Administration Defendants) and a

new legal claim (fraud).  We granted leave to amend on September 10, 2014 (Doc.

67), but ordered Plaintiffs to revise their proposed amended pleading before

submitting it.  We noted that the amended complaint, as drafted, spanned 430

numbered paragraphs and 84 pages, and we directed Plaintiffs to "pare down their

pleading to encompass a 'short and plain statement' showing their entitlement to

relief."  (*Id.* at p. 9 (quoting FED. R. CIV. P. 8(a)(2))).

After making revisions, Plaintiffs filed the operative Second Amended

Complaint on October 14, 2014.  (Doc. 69).  Relevantly, the amended pleading

added the four Administration Defendants and a claim for fraud (Count IV), as

well as new and expanded factual allegations.  Plaintiffs also reasserted their

claims under the Equal Protection Clause of the Fourteenth Amendment (Count I);

for conspiracy in violation of 42 U.S.C. § 1983 (Count II); and pursuant to Article

I § 26 of the Pennsylvania Constitution (Count III).

Defendants filed another Motion to Dismiss on October 28, 2014.  (Doc.

73).  In the course of briefing, the parties agreed to the dismissal of Plaintiffs'

fraud claim.  We ruled on the remainder of the pending issues, denying

Defendants' Motion with regard to Plaintiffs' equal protection claim, conspiracy

claim, and Pennsylvania constitutional claim.  (Doc. 85).  We also declined to

dismiss the new Defendants added pursuant to Plaintiffs' operative Second

Amended Complaint.  We granted Defendants' Motion insofar as it related to

Plaintiffs' request for compensatory damages under the Pennsylvania Constitution and punitive damages against Defendants in their official capacities.

On March 18, 2015, Defendants filed an Answer to Plaintiffs' Second Amended Complaint.  (Doc. 90).  Several discovery disputes subsequently ensued and were summarily resolved, and the Court twice granted Defendants' Motions for Sanctions to dismiss nonresponsive Plaintiffs from the case.  (Docs. 96, 118). The parties also engaged in an unavailing attempt to settle the matter.  (Doc. 103).

On July 11, 2016, Defendants filed the currently pending Motion for Summary Judgment.  (Doc. 129).  The Motion has been fully briefed (docs. 131, 133, 135) and is thus ripe for our review.  As noted, the Motion shall be granted in full and Plaintiffs' claims dismissed for the reasons elucidated below.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate if the moving party establishes "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A dispute is "genuine" only if there is a sufficient evidentiary basis for a reasonable jury to find for the non-moving party, and a fact is "material" only if it might affect the outcome of the action under the governing law.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A court should view the facts in the light most favorable to the non-

moving party, drawing all reasonable inferences therefrom, and should not evaluate credibility or weigh the evidence.  *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)).

Initially, the moving party bears the burden of demonstrating the absence of a genuine dispute of material fact, and upon satisfaction of that burden, the non-movant must go beyond the pleadings, pointing to particular facts that evidence a genuine dispute for trial.  *See id.* at 773 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)).  In advancing their positions, the parties must support their factual assertions by citing to specific parts of the record or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  FED. R. Civ. P. 56(c)(1).

A court should not grant summary judgment when there is a disagreement about the facts or the proper inferences that a factfinder could draw from them.  *See Reedy v. Evanson*, 615 F.3d 197, 210 (3d Cir. 2010) (citing *Peterson v. Lehigh Valley Dist. Council*, 676 F.2d 81, 84 (3d Cir. 1982)).  Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment."  *Layshock ex rel. Layshock v.*

*Hermitage Sch. Dist.*, 650 F.3d 205, 211 (3d Cir. 2011) (quoting *Anderson*, 477

U.S. at 247-48) (internal quotation marks omitted).

## IV.   DISCUSSION

The case at hand largely depends upon the strength of Plaintiffs' claim under

the Equal Protection Clause of the Fourteenth Amendment to the United States

Constitution.  Plaintiffs' § 1983 allegations cannot survive unless they are

premised on an underlying constitutional violation,[9] while the Pennsylvania

Supreme Court has concluded that Article I § 26 of the Pennsylvania Constitution

should be analyzed under the same standards used to evaluate federal equal

protection claims.  *See Small v. Horn*, 722 A.2d 644, 672 n.13 (Pa. 1998).  Mindful

of this important observation, we proceed to analyze the parties' arguments

pursuant to the Equal Protection Clause.

### A.   Equal Protection

In outlining their equal protection claim, Plaintiffs contend that New Hope

was – and Plaintiffs, by extension, were – treated differently from other similarly

---

[9]  42 U.S.C. § 1983 does not create substantive rights, but rather provides a federal cause of action for the violation of a federal right.  *Dique v. N.J. State Police*, 603 F.3d 181, 185 (3d Cir. 2010) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).  To state a § 1983 claim, a plaintiff must show that the offensive conduct was committed by a person acting under color of state law and deprived the plaintiff of rights secured under the Constitution or federal law.  *See Elmore v. Cleary*, 399 F.3d 279, 281 (3d Cir. 2005); *Cahill ex rel. L.C. v. Live Nation,* 512 Fed. Appx. 227, 230 (3d Cir. 2013).  Here, Plaintiffs' § 1983 claim alleges that Defendants conspired to deprive Plaintiffs of a constitutional right—equal protection under the laws.

situated charter schools.  Plaintiffs further contend that Defendants can articulate no rational basis for the difference in treatment.

The Equal Protection Clause of the Fourteenth Amendment commands that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. CONST. amend. XIV, § 1.  The Clause does not prohibit differentiation among classes of persons, but rather restrains a state from "treating differently persons who are in all relevant respects alike."  *Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) (citation omitted).  Where a plaintiff does not allege membership in a particular group, he or she may advance an equal protection challenge on a "class of one" theory by proving that, (1) "she has been intentionally treated differently from others similarly situated," and (2) "there is no rational basis for the difference in treatment."  *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (*per curiam*) (citations omitted).  Plaintiffs here proceed on the "class of one" theory.

Entities are similarly situated for purposes of the Equal Protection Clause when they are alike "in all relevant aspects."  *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008) (quoting *Nordlinger*, 505 U.S. at 10) (internal quotation marks omitted).  In our Circuit, a plaintiff need not show that comparators are *identical* in all relevant aspects but rather that they share pertinent similarities.  *See Borrell v. Bloomsburg Univ.*, 955 F. Supp. 2d 390, 405 (M.D. Pa. 2013).

"Determining whether an individual is 'similarly situated' to another individual is a case-by-case fact-intensive inquiry." *Id.* (quoting *Chan v. Cnty. of Lancaster*, No. 10-3424, 2011 WL 4478283, at *15 (E.D. Pa. Sept. 26, 2011)) (internal quotation marks omitted).

Plaintiffs primarily focus on Helen Thackston Charter School ("Thackston") as an appropriate comparator entity.[10]   Thackston is a charter school within the School District of the City of York that teaches grades 5-9.  (Doc. 69, ¶ 166; doc. 131, p. 18).[11]   While Plaintiffs assert that Thackston's students' substantive academic scores are equivalent to those of New Hope students (Doc. 69, ¶ 227), Defendants rely on the PSSA scores of students from the respective schools to show that Thackston students scored higher than both District and New Hope students alike.  (Doc. 130, ¶ 40).  New Hope's PSSA scores, by comparison, were the lowest of all three schools.  (*Id.*); *New Hope*, 89 A.2d at 733 ("New Hope's percentages of students scoring proficient on the PSSA have been lower than the percentages of students scoring proficient in the School District's schools in all

---

[10]   Plaintiffs also pled various allegations seeming to indicate that another school, Crispus Attucks Youthbuild Charter School ("Crispus Attucks"), was similarly situated to New Hope. Defendants explain that Crispus Attucks is a charter school in the city of York specifically designed to educate former high school dropouts.  (Doc. 130, ¶ 23).  As such, its student body and programming are unique from those of New Hope.  Plaintiffs have not refuted Defendants' allegations regarding Crispus Attucks' unique programming.  We therefore find that Crispus Attucks is too dissimilar from New Hope and does not qualify as a valid comparator entity for purposes of Plaintiffs' equal protection claim.

[11]   As noted in the Factual Background (Section I.B) above, during its last years in operation, New Hope taught grades 5-12.  (Doc. 131, p. 18).

years that it has been in existence.").  Indeed, the percentages of New Hope's

students scoring proficient or better on the PSSA in the five years of its charter are

reproduced as follows:

|      | Reading | Math  |
|------|---------|-------|
| 2008 | 36.6%   | 19.9% |
| 2009 | 32.6%   | 22.4% |
| 2010 | 32.5%   | 31.5% |
| 2011 | 34.7%   | 32.3% |
| 2012 | 37%     | 35%   |

*New Hope*, 89 A.2d at 733.

In its opinion reviewing the decision of the CAB to uphold the Board's

decision not to renew New Hope's charter, the Commonwealth Court explains that

"[t]he increases in math proficiency [at New Hope] correspond in part to higher

proficiency rates in new 6th and 7th grade classes, not solely to increased

proficiency levels in existing students from one year to the next."  *Id*. (citing the

school board's exhibit showing 2009 math proficiency rates of 33% for 6th grade

and 40.4% for 7th grade versus 31.3% for 8th grade).  By way of comparison, in

2011, 55% of Thackston's students scored proficient or better in mathematics on

the PSSA and 41.9% scored proficient or better in reading.  (Doc. 130-23).

As further evidence that Thackston's academic performance was superior to New Hope's, Defendants present a review of publicly accessible Pennsylvania School Performance Profiles, published by the Pennsylvania Department of Education.  (Doc. 131, p. 16).  For the 2012-13 school year, New Hope received a "Building Level Academic Score" of 46.8 out of a possible 100 while Thackston received a 57.5.  (Doc. 131, p. 16 (citing doc 130-38); doc. 130, ¶ 81).  In the same year, at New Hope 26.57% of the students were determined to be "proficient" or "advanced" in mathematics and 22.3% were determined to be "proficient" or "advanced" in reading.  (Doc. 131, p. 16).  At Thackston, students' percentages were determined to be 53.35% and 47.66%, respectively.  (*Id*.).

Finally, Defendants emphasize that unlike New Hope, Thackston was able to achieve AYP for at least one year of operation.  By comparison, New Hope did not achieve AYP throughout its operational school years.  (Doc. 130, ¶¶ 44, 46; doc. 134 ¶¶ 44, 46).  Plaintiffs stress that both schools did not meet the AYP minimum compliance standards.  (Doc. 69, ¶ 230; doc. 134, ¶ 44).[12]

---

[12] Thackston achieved AYP in its first year of operation (doc. 130, ¶ 44), but as noted in the Factual Background, No Child Left Behind specifies that any school that fails to achieve AYP in four out of five years of the school's charter fails to meet the minimum compliance standards. (Doc. 134, ¶ 44).  While "some district schools achieved AYP at different times," (doc 130, ¶ 45), Plaintiffs also point out that the City School failed to meet AYP for at least a decade.  (Doc. 69, ¶ 232; doc 134, ¶¶ 45-46).  This fact may indicate that the City School too is struggling academically; however, the City School is a public high school and has not been chosen as a comparator school.  Thus, its performance, while not grossly dissimilar to New Hope's own, is not relevant for the purposes of our analysis here.

Defendants assert that the "primary reason" New Hope's charter was not renewed was due to the school's poor test scores and academic results. (Doc. 130, ¶ 69). This, they argue, is the principal justification for why this Court should find that New Hope was not similarly situated to Thackston. Defendants further argue that New Hope's poor results amount to a rational basis for treating New Hope differently from Thackston. They also point to the differences in the grades the two schools taught, and differences in the respective schools' governance structures. Specifically, Defendants note that one man, Isiah Anderson, was primarily responsible for New Hope's operations, headed the school's management company, and owned the building that housed the school. (Doc. 131, p. 18). In considering this arrangement, the Commonwealth Court of Pennsylvania observed that the Board "found that New Hope's board of trustees did not discuss or consider the terms of the management agreements, leases, and AEDY contract with Anderson's businesses before approving them, and those findings are amply supported by the record." (Doc. 131, p. 18 (citing Exh. 41)). Defendants provide no specifications regarding how Thackston was managed. (*Id.*).

Unsurprisingly, Plaintiffs disagree with Defendants' characterization of Thackston and New Hope as dissimilar schools. Among other factors, Plaintiffs emphasize that the schools are both: (1) within the City of York; (2) subject to the jurisdiction of the District; (3) serve the same geographic population; (4) funded by

the District; (5) subject to the same charter renewal application process (at least in theory – Plaintiffs of course dispute the similarity with which the application process was conducted in practice); and (6) subject to the same charter school laws. (Doc. 133, p. 14). Plaintiffs also emphasize that Thackston was funded by a donor from either Arizona or Nevada, whose identity remains unknown and should therefore have been subject to the same scrutiny as Isiah Anderson of New Hope. (*Id.*). Plaintiffs argue that, unlike New Hope, at no point did the Board investigate Thackston's management processes, let alone subject Thackston to the same rigorous investigation that New Hope received. Defendants counter that they had no reason to suspect Thackston's anonymous donor had any relation to the Thackston's governance or construction and management contracts.

Thackston sought renewal of its charter in the 2013-14 school year, effective for the 2014-15 school year. (Doc. 130, ¶ 76). Throughout its renewal process, Thackston was evaluated under the Pennsylvania Value Added Assessment System ("PVAAS") rather than solely by its PSSA test scores or AYP. New Hope had in fact requested to be evaluated under PVAAS as well, because its academic achievements appeared more substantial when viewed through that lens;[13] however, the Board refused to use PVAAS to evaluate New Hope, noting that "PVAAS shows growth from one point in time to another, but is not a measure of

---

[13]   Indeed, the Administration's committee members noted that "the PVAAS data does show growth" in terms of New Hope's academic progress. (Doc. 133-7, ¶ 5).

student achievement." (Doc. 130, ¶ 61). Defendants further explain that, at the time New Hope made its request, PVAAS was not an accepted standard under the Department of Education Regulations and the AYP system. (Doc. 130, ¶ 62). By the time Thackston was evaluated, however, the newly minted School Performance Profile was used, with PVAAS as an approved component of the Profile. (Doc. 130, ¶¶ 91-93; doc. 135, pp. 9-10).[14]

Ultimately, despite Thackston's academic shortcomings, the School Board voted to renew its charter. (Doc. 69, ¶¶ 166, 169). Moreover, District officials met with Thackston prior to renewing its charter and allowed Thackston to correct any identified deficiencies, but did not do the same for New Hope. (*Id.* ¶¶ 224-25). Following this meeting, the District did not direct the initiation of non-renewal proceedings against Thackston. (*Id.* ¶ 226). Due to the similarities between New Hope and Thackston, Plaintiffs argue that there was no rational basis for any variation in the treatment rendered to either school.

Neither party has presented us with federal case law demonstrating how courts have judged the similarity of charter schools in the past. In *Project Reflect, Inc. v. Metropolitan Nashville Bd. of Public Educ.*, 947 F.Supp.2d 868, 881 (M.D. Tenn. 2013), the District Court for the Middle District of Tennessee found, on a Motion to Dismiss, that plaintiffs failed to allege the existence of another similarly

---

[14]  We also note that New Hope's charter specifically provided for the evaluation of New Hope's academic progress through use of PSSA testing. (See above, Factual Background, Section I.B).

situated charter school where they acknowledged that their school was the only one performing in the bottom 5%. *Project Reflect*, 947 F.Supp.2d at 881 (dismissing plaintiffs' equal protection claim). Here, too, Plaintiffs do not refute Defendants' statement that New Hope students scored the lowest on PSSA testing, as compared to the District Students and Thackston. (Doc. 134, ¶¶ 79, 80). Plaintiffs also admit that the 2012-13 School Performance Profiles indicate that Thackston students were vastly outperforming New Hope students in proficiency for mathematics and reading. (*Id.*). While the parties agree that New Hope showed improvement when its academic performance was evaluated using PVAAS, the District was able to articulate a rational and non-arbitrary reason for its decision to focus on AYP and PSSA test scores rather than PVAAS during New Hope's evaluation. As noted above, PVAAS had not been endorsed as a valid evaluation system at the time that New Hope was subject to non-renewal proceedings. Plaintiffs have presented no agrument disputing Defendants' explanation of the decision to use different evaluation metrics.

Section 1729-A(a)(2) of the Charter School Law "permits a school district to deny renewal of a chart school's charter for failure to meet student academic performance standards." *New Hope*, 89 A.2d at 736 (citing 24 P.S. § 17-1729-A(a)(2); *Ronald H. Brown Charter Sch. v. Harrisburg City Sch. Dist.*, 928 A.2d

1145, 1152-53 (Pa. Cmwlth. 2007)).[15]  We find that the described differences in the schools' performance, as well as the highly concentrated governance structure at New Hope under Isiah Anderson, render the two schools dissimilar for purposes of a "class of one" comparison.  As such, the differences provided a sufficient basis for Defendants to evaluate the two schools differently by giving Thackston greater opportunity to correct its shortcomings as compared to that afforded to New Hope.

Without a valid comparator entity, a plaintiff cannot make out a claim under the Equal Protection Clause.  However, even if Thackston and New Hope were sufficiently similar comparators, Defendants could still defeat Plaintiffs' claim by showing that there was a rational basis for classifying them separately.  Under rational-basis review, a classification is unconstitutional if it is "irrational and wholly arbitrary."  *Eichenlaub v. Twp. of Indiana*, 385 F.3d 274, 286 (3d Cir. 2004) (quoting *Olech*, 528 U.S. at 564) (internal quotation marks omitted); *see Highway Materials, Inc. v. Whitemarsh Twp.*, 386 Fed. App'x 251, 259 (3d Cir. 2010) (explaining that class-of-one challenges fail when "'there is any reasonably conceivable state of facts that could provide a rational basis for the classification'" (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993))).  Although we may even

---

[15]  The Commonwealth Court of Pennsylvania further notes that 24 P.S. § 17-1729-A(a)(2) was the operative law in effect when Defendants decided not to renew New Hope's charter.  (Doc. 130-29, pp. 9-10).

hypothesize a legitimate public purpose in applying rational basis review, *see Am. Express Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359, 367 (3d Cir. 2012), we must still strike down a classification "that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications."  *Kelo v. City of New London, Conn.*, 545 U.S. 469, 491 (2005) (Kennedy, J., concurring) (citing, *inter alia*, *Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 446-47 (1985)).

Assuming *arguendo* that Thackston and New Hope are sufficiently similar to constitute comparators, we find that the consistent and repeated disparities in the schools' academic performances, as demonstrated by their PSSA scores, Building Level Academic Scores, AYP achievements and School Performance Profiles, are sufficient to support Defendants' decision not to renew New Hope's charter and provide a rational basis for the District's differing treatment of the two entities.  As noted above, the record shows Thackston consistently outperformed New Hope on myriad metrics of academic performance and achievement.

Though our determination is made independently of the analysis put forth by the Commonwealth Court of Pennsylvania, we also note that its findings support our determination here.  Ultimately, that court concluded that the Board's findings (1) that New Hope's curriculum was not in compliance with Chapter 4's academic standards; and (2) that New Hope's student performance "had not shown real or

27

steady improvement," both had ample support from the record. (Doc. 130-29, p. 12).

In their Answer to Statement of Facts (doc. 134), Plaintiffs contest the extent of the Board's knowledge of New Hope's academic shortcomings at the time New Hope's charter was not renewed. (Doc. 134, ¶¶ 40, 78-81). Defendants emphasize, however, and we concur, that it would be improper for this Court to conduct a secondary review of whether New Hope was misevaluated by the Board, the CAB, and the Commonwealth Court. *Marlboro Corp. v. Assc. of Independent Colleges  Schs., Inc.*, 556 F.2d 78 (1st Cir. 1977); *Yan v. Penn State Univ.*, No. 4:10-cv-0212, 2010 WL 3221828, at *6 (M.D.Pa. Aug. 13, 2010) ("There are some forms of state action . . . which by their nature involve discretionary decision making based on a vast array of subjective, individualized assessments.").

Indeed, Plaintiffs also agree that the Court would be unable to engage in such a review, but argue that the holding *Marlboro* is inapposite due to evidence showing partiality on the part of the Board here in conducting New Hope's review. However, no such evidence has been forthcoming on the record. Plaintiffs ask that the Court infer nefarious intentions from the directive the Board was given to pay close attention to any reason New Hope's charter might be subject to non-renewal; but rather than indicate bias or partiality, we find that without further support for Plaintiffs' contentions, this evidence merely indicates that the Board was instructed

to be diligent in considering the matter at hand—New Hope's non-renewal.  To infer an odious purpose from an instruction to place "special emphasis on areas of weakness" to determine "[p]ossible reasons for Nonrenewal/Revocation" of New Hope's Charter without more than the aforesaid directive is too far a departure from the record before us and has no factual justification.  (Doc. 133, p. 15).

We now address a related point.  At the core of Plaintiffs' allegations is the contention that Defendants "targeted" New Hope for non-renewal.  They also underscore that Thackston and New Hope shared certain administrative shortfalls. Finally, Plaintiffs allege that Defendants employed the Levin Legal Group and specifically Attorney Allison Petersen to advise them in the non-renewal of New Hope's charter, but notably have not named either the Levin Legal Group or Attorney Petersen as Defendants in the instant litigation.

While we are not unsympathetic to Plaintiffs' arguments, these allegations are, on the whole, inapposite to our rational basis review.  Even if Defendants also targeted New Hope for non-renewal due to the District's financial concerns, and even if Thackston was indeed responsible for similar oversights in its governance, such allegations do not alter our finding that Defendants are able to differentiate the two schools and based their decision not to renew New Hope's charter on a non-arbitrary, concrete and specific reason—the school's academic shortcomings. That justification amounts to a rational basis for the differentiation in treatment

that is beyond mere pretext.  Having established that basis, Defendants are able to defeat Plaintiffs' claims of an equal protection violation.

Similarly, Plaintiffs dedicate an entire section of their brief in opposition to drawing this Court's attention to discrepancies in Defendants' testimony, gathered over the course of thirty-five depositions.  These discrepancies, Plaintiffs allege, amount to false testimony.  We agree with Plaintiffs that any inconsistencies in Defendants' evidence should be construed in a light most favorable to Plaintiffs. *See Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 772 (3d Cir. 2013) (noting that a court should view the facts in the light most favorable to the non-moving party, drawing all reasonable inferences therefrom).  However, in order to defeat Defendants' summary judgment motion, the discrepancies must be material such that they would affect the outcome of the action.  *See Sovereign Bank v. BJ's Wholesale Club, Inc.*, 533 F.3d 162, 172 (3d Cir. 2008).

The Court has carefully reviewed the nineteen discrepancies that Plaintiffs identify, and we conclude they do not in any way refute the evidence that New Hope's academic achievements were inferior to those of Thackston.  Rather, the inconsistencies focus on a variety of administrative minutia including:

(1) whether there was an "executive session" regarding the Thackston vote;[16]

---

[16]  Defendants state that the deposition testimony that Plaintiffs cited to establish this discrepancy came, in part, from District School Board members Glenn Medice and Diane Brown and was taken pursuant to separate litigation involving the District.  (Doc. 135, pp. 17-18 n. 7).  Defendants therefore argue that references to these materials are counter to FED. R. CIV. P. 32(a)(8) and should be stricken.  However, they have not filed a motion to that effect.

(2) whether the Board was provided with written materials to review prior to or at the start of their meeting to vote on the renewal of Thackston's charter; (3) whether the Administration explained its rationale for recommending that New Hope's charter not be renewed at a public board meeting or at subsequent non-renewal proceedings.

(Doc. 133-23).[17]

These discrepancies, and others that Plaintiffs list, even if taken in the light most favorable to Plaintiffs, are simply not enough to overcome Defendants' rational basis for the nonrenewal of New Hope's charter and alter the outcome of this litigation.  First, in a case where discovery involving thirty-five depositions commenced in 2015 and focused on events transpiring predominantly from 2011-2013, some discrepancy in testimony, particularly regarding administrative details, is to be expected.  At bottom, we perceive that these discrepancies may involve mistaken recollection, and not necessarily amount to "falsehood," as Plaintiffs hyperbolically suggest.  Second, and more importantly, like Plaintiffs' other arguments, much of this factual matter is inapposite to Defendants' stated rational basis for electing to renew Thackston's charter and not New Hope's.[18]  Again,

---

[17]  The discrepancy Plaintiffs describe as "#3" is in regard to whether there were one or two committee meetings to determine whether to renew New Hope's charter.  (Doc. 133-23, p. 3). Plaintiffs again cite to deposition testimony of Board Member Diane Brown for the proposition that there was only one meeting, which is in contradiction to the Board's January 13, 2013 minutes. Defendants again emphasize that Brown was not on the Board at the time of the New Hope nonrenewal decision.  (Doc. 135, p. 18, 18 n. 7).

[18]  Only "# 9" regarding whether Thackston achieved AYP is appurtenant to the schools' academic achievements.  At one point, Defendant Margie Orr testified that she thought

Defendants rightly stress that in order to survive rational basis review, Plaintiffs'

evidence must indicate that Defendants' actions were not rationally related to *any*

legitimate government purpose.  Without the debunking the differences that

Defendants identify between the two schools, which we have determined amount

to a rational basis for the differentiation in treatment, the discrepancies in

testimony Plaintiffs identify do not affect the outcome of our analysis to a material

degree.

As we stated in our Memorandum in response to Defendants' Motion to

Dismiss,

> [i]t is with utmost restraint and strict adherence to the appropriate standard
> of review that we permit Plaintiffs' [equal protection] claim to survive.
> Certainly, on a motion for summary judgment, "[Plaintiffs] will have to offer
> an ascending quantum of proof that [D]efendants' actions were not
> rationally related to a legitimate government purpose." *Montanye v.
> Wissahickon Sch. Dist.*, 327 F. Supp. 2d 510, 520 (E.D. Pa. 2004).  But we
> may not dismiss their claim at this stage merely because it may be unlikely
> that they will be able to carry that burden.  *See Phillips*, 515 F.3d at 231.

(Doc. 85).  That Defendants' actions were not rationally related to a legitimate

government purpose is a high threshold to meet, and one that Plaintiffs have failed

to achieve here.  We are not unsympathetic to the fact that Plaintiffs placed great

value upon a charter school that has now been extinguished through the proper

---

Thackston achieved AYP each year of its operation.  (Doc. 133-23, p. 6).  However, Defendants
have not argued that Ms. Orr was accurate and rather admit that Thackston only met AYP once
in five years.  (Doc. 130-24).  Indeed, the Court has conducted the foregoing analysis in the light
most favorable to Plaintiffs and on the premise that the parties agree on that matter.

processes mandated by Pennsylvania law.  However, we have no alternative but to dismiss Plaintiffs' equal protection claim, as well as Plaintiffs' claim under the Pennsylvania Constitution, Article I § 26,[19] because we find no actions by Defendants that run afoul of the relevant federal or state constitutions.

### B.  Conspiracy in violation of 42 U.S.C. § 1983

To demonstrate a conspiracy under § 1983, plaintiffs must show that two or more conspirators reached an agreement to deprive them of a constitutional right under color of law.  *See Parkway Garage, Inc. v. City of Phila.*, 5 F.3d 685, 700 (3d Cir. 1993), *abrogated on other grounds by United Artists Theatre Circuit, Inc. v. Twp. of Warrington, PA*, 316 F.3d 392 (3d Cir. 2003).  As a threshold matter, a § 1983 conspiracy claim must involve an actual deprivation of a federally protected right.  *See Sweetman v. Borough of Norristown, PA*, No. 13-3540, 2014 WL 293430, at *2 (3d Cir. Jan. 28, 2014) ("A § 1983 conspiracy claim is viable only if there has been an actual deprivation of a constitutional right."); *Perano v. Twp. of Tilden*, 423 Fed. App'x 234, 239 (3d Cir. 2011) (same); *see also Torres-Rosado v. Rotger-Sabat*, 335 F.3d 1, 14 (1st Cir. 2003); *Vaden v. Village of Maywood, Ill.*, 809 F.2d 361, 366 (7th Cir. 1987); *Marchese v. Umstead*, 110 F. Supp. 2d 361, 371

---

[19]  As noted at the outset of our analysis, the Pennsylvania Supreme Court has held, and the parties do not dispute, that Article I § 26 should be analyzed under the same standards used to evaluate federal equal protection claims.  *See Small v. Horn*, 722 A.2d 664, 672 n.13 (Pa. 1998). We therefore dispose of Plaintiffs' state law constitutional claim on the same grounds as their federal equal protection claim.

(E.D. Pa. 2000); *Holt Cargo Sys., Inc. v. Del. River Port Auth.*, 20 F. Supp. 2d 803, 843 (E.D. Pa. 1998).

Plaintiffs' § 1983 conspiracy claim is founded on the allegation that Defendants conspired and entered into an agreement "among themselves to deprive Plaintiffs of their constitutional rights by . . . treating New Hope differently than similarly situated charter schools and, consequently, treating the within Plaintiffs differently than similarly situated persons." (Doc. 69, ¶ 324). In the foregoing analysis, however, this Court concluded that Defendants had a rational basis for the treatment that New Hope received, resulting in the decision not to renew New Hope's charter. Because of this determination, we hold that no equal protection violation has, in fact, occurred. Without such an actual deprivation of a constitutionally protected right, there can be no premise for Plaintiffs' § 1983 claim. The claim shall therefore be dismissed.

### C.    Spoliation of Evidence

Plaintiffs have not filed a motion for sanctions due to alleged spoliation of evidence. Nor do Defendants address the potential of such a motion in their Motion for Summary Judgment or brief in support thereof. However, Plaintiffs assert an argument for spoliation in their brief in opposition to Defendants' Motion (doc. 133) and Defendants provide a substantive response to the merits of the allegation in their Reply Brief. (Doc. 135). Thus, we too shall address the merits

of Plaintiffs' spoliation allegation.  For the following reasons, we conclude that it too is misplaced.

"In law, spoliation refers to the hiding or destroying of litigation evidence, generally by an adverse party." *Williams v. BASF Catalysts LLC*, 765 F.3d 306, 320 (3d Cir. 2014) (internal citations and quotations omitted).  "In the event that a party undertakes spoilage, the sanctions available to a court include dismissal of the relevant claim or a presumption by the factfinder that the spoiled evidence was harmful to the offending party's case." *Capogrosso v. 30 River Court East Urban Renewal Co.*, 482 Fed.Appx. 677, 682 (3d Cir. 2012) (citing *Bull v. United Parcel Service, Inc.*, 665 F.3d 68, 72-73 (3d Cir. 2012)).  "The spoliation inference is a permissive inference that is predicated on the "common sense observation" that when a party to an adversarial proceeding destroys relevant evidence it is likely done out of fear that the evidence would be harmful to that party." *Kounelis v. Sherrer*, 529 F.Supp.2d 503, 520 (D.N.J. 2008) (citing *Mosaid Techs. Inc. v. Samsung Elec. Co.*, 348 F.Supp.2d 332, 336 (D.N.J. 2004)).  In this instance, Plaintiffs presumably seek an adverse inference that the evidence they claim was subject to spoliation contains information harmful to Defendants' case.

For spoliation to properly arise, four elements must be met.  "Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding

of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull*, 655 F.3d at 73.[20]

The spoliation allegations here center on the deleted email account of former Assistant Superintendent Perry-Cross. (Doc. 133, pp. 25-26). Defendant Perry-Cross retired from her position at the District in February 2012; her email account was purged at some point thereafter. (Doc. 135, p. 23). The parties agree that the first two elements of spoliation—that the emails were within Defendants' control and they were relevant to the claims of the instant case—are not at issue. The second two elements, however, are in dispute. Defendants argue that the emails were deleted as a matter of course and Defendants were by no means attempting to suppress evidence. (*Id*. p. 21). They further argue that at the time the emails were deleted, there was no reasonably foreseeable duty to preserve the account. (*Id*.). We agree with Defendants regarding both their arguments of foreseeability and intentionality. We thus find that Plaintiffs' allegations of spoliation have no merit.

We first address Defendants' arguments related to intent. As noted, Defendant Perry-Cross left the District in February 2012. Her email account, along with all of the emails it contained, was deleted thereafter. Defendants suggest that this may have occurred as soon as ninety days after Defendant Perry-

---

[20] We clarify that these four elements pertain to a court's analysis of whether spoliation in fact occurred. Once a court uses these four considerations to determine whether spoliation exists, a separate and distinctive set of elements applies to a decision of whether to apply spoliation sanctions. *Bull*, 665 F.3d at 73 n.5; *see also Schmid v. Milwaukee Elec. Tool Corp.*, 13 F.3d 76, 79 (3d Cir. 1994) (discussing the elements of an analysis of spoliation sanctions).

Cross left, in keeping with the District's general practice (doc. 133-27, 13:14-24), while Plaintiffs allege, without specifying where in the record they may have derived this information, that "Ms. Perry's emails were purged sometime after 2012." (Doc. 133, p. 27).[21]

The Third Circuit has stressed that "[a]lthough a District Court has discretion to draw inferences from the record on a party's intent, it strays beyond the bounds of its discretion when . . . there is no factual basis to do so." *Bull*, 665 F.3d at 74 (reversing a district court's decision that spoliation sanctions were appropriate where there was no evidentiary basis for an inference that the plaintiff specifically intended to withhold original copies of medical notes, where the originals were located at her home, were listed as part of a discovery request, and defendants challenged the authenticity of the copies produced).

Plaintiffs here have presented no factual basis whatsoever in support of their allegations that Defendants' intended to destroy evidence helpful to Plaintiffs' claims. Rather, the District's policy of purging former employees' email accounts

---

[21]  Without the benefit of a citation to the record, it is possible that Plaintiffs may have derived their allegation from the deposition testimony of network systems administrator for the York City School District, Michael Ferguson. (Doc. 133-27). On the thirteenth page of that testimony, Mr. Ferguson vaguely refers to the deletion of an unspecified email account in December 2013. However, the pages of prior testimony that might have elucidated the matter of which account Mr. Ferguson was referring to are inexplicably not included in the record. Because multiple email accounts have been both deleted and referred to in the course of this ongoing litigation, including, for example, the account of Dr. Wortham, the Court cannot conclude that Mr. Ferguson was referring to Ms. Perry-Cross's account. It is not our place to speculate favorably on behalf of Plaintiffs without any factual support, particularly given that the timeframe mentioned in Mr. Ferguson's testimony (December 2013) does not correlate with that Plaintiffs assert ("sometime after 2012" (Doc. 133, p. 27)).

within ninety days, and the fact that litigation did not commence until well over a year after Defendant Perry-Cross left the District and potentially over a year after the deletion occurred amounts to evidence supporting the opposite conclusion. Defendants also point to their swift and prompt reaction to turn over newly discovered evidence in the form of another District employee's email account after previously believing it was deleted.  (Doc. 135, pp. 21-22).  This compilation of evidence, taken as a whole, leads the Court to conclude that Plaintiffs have failed to support their allegation that Defendants acted with intent to spoil evidence when they deleted Defendant Perry-Cross's email account.

We turn next to the issue of whether Defendants had a duty to preserve the emails at the time of their deletion.  While the time period concerning the deletion is in dispute, the parties do agree that litigation in the instant matter did not commence until the filing of Plaintiffs' first complaint on November 19, 2013. Thus, even taking the later date on which Plaintiffs' allege the deletion occurred (sometime after 2012) as true, Plaintiffs must still argue that Defendants' duty to preserve the emails arose nearly eleven months before Plaintiffs' Complaint was first filed.

> An independent duty to preserve relevant evidence arises when the party in possession of the evidence knows that litigation by the party seeking the evidence is pending or probable and the party in possession of the evidence can foresee the harm or prejudice that would be caused to the party seeking the evidence if the evidence were to be discarded.  If, however, the

duty to preserve evidence has not been triggered at the time the evidence was destroyed, then there can be no spoliation.

*Kounelis v. Sherrer*, 529 F.Supp.2d 503, 518 (D.N.J. 2008) (internal citations and quotations omitted).

Plaintiffs attempt to persuade the Court that "[t]here can be no credible argument that the defendants were not aware that the disruption of 700-800 children and tens of millions of dollars would not produce litigation" such that Defendants should have been on notice of their duty to preserve Defendant Perry-Cross' email account. (Doc. 133, p. 28). We disagree. Plaintiffs' argument that by the simple act of doing their jobs, Defendants should have been on notice of litigation that would not commence until nearly a full year later does not create knowledge that litigation is "pending or probable." In *Kounelis v. Sherrer*, the District Court for the District of New Jersey found that a pending disciplinary proceeding that commenced just one day after an altercation between a prison inmate and prison guards was sufficient to trigger the defendants' duty to preserve the video footage of the altercation. Here, however, Plaintiffs waited nearly a year before instituting proceedings. Further, while Plaintiffs do not argue that New Hope's move to appeal the Board's decision of non-renewal to the CAB constituted a triggering action, Defendants stress that this process did not commence until October 2012, eight months after Defendant Perry-Cross retired, and that the CAB appeals process does not involve discovery. (Doc. 135, p. 23).

Thus, the appeal alone would not place Defendants on notice of their duty to preserve evidence; nor would it be sufficient to warn them of pending litigation from the students and parents of students of New Hope, who launched the instant federal proceeding separate and apart from New Hope's own appeal to the CAB.

For all of the reasons discussed, we find that Plaintiffs have presented no evidence tending to show that Defendants acted with intent when they deleted Defendant Perry-Cross's email account.  Plaintiffs have also failed to present any evidence adducing that a duty to preserve arose prior to the deletion of the account. As such, they have failed to establish both the third and fourth elements of spoliation, and we find that their allegation has no merit.

## V.	CONCLUSION

For the foregoing reasons, we shall grant Defendants' Motion for Summary Judgment (Doc. 129) in its entirety.  A separate order shall issue in accordance with this ruling.